UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO STALLING,

                      Petitioner,                Case No. 4:16-cv-10517
                                                          Honorable Linda V. Parker

v.

S.L. BURT,

                      Respondent.
_____/

## OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) GRANTING A CERTIFICATE OF APPEALABILITY WITH RESPECT TO PETITIONER'S FIRST AND FIFTH CLAIMS, AND (3) DENYING A CERTIFICATE OF APPEALABILITY WITH RESPECT TO HIS REMAINING CLAIMS

Michigan prisoner Antonio Stalling ("Petitioner") filed this habeas case under 28 U.S.C. § 2254. Petitioner is challenging his convictions after a jury trial in the Wayne County Circuit Court of assault with intent to murder, possession of a firearm by a felon, and possession of a firearm during the commission of a felony. The trial judge sentenced Petitioner to terms of incarceration of 15 to 25 years for the assault with intent to murder conviction, 1 to 5 years for the felon in possession conviction, and a consecutive 2-year term for the felony-firearm conviction.

In support of his request for habeas relief, Petitioner raises five claims: (1) Petitioner was denied his confrontation rights when he was precluded from questioning the victim whether the prosecutor threatened him with perjury; (2)

Petitioner was denied the effective assistance of trial counsel; (3) the prosecutor committed acts of misconduct; (4) there was insufficient evidence presented at trial; and (5) Petitioner was denied his right to a public trial when the courtroom doors were locking during opening statements and closing arguments.

The Court finds that Petitioner's claims are without merit. Therefore, it is denying Petitioner relief. The Court is granting Petitioner a certificate of appealability with respect to his first and fifth claims, however.

## I. Background

Petitioner was charged with the above-described offenses in connection with the shooting of his cousin, Isaac Johnson, on December 31, 2011.

At Petitioner's preliminary examination, Johnson testified that he was forty-seven years old, and he identified Petitioner as his first cousin. (2/3/12 Tr. at 11, ECF No. 7-2 at Pg ID 258.) Johnson testified that at the time of the shooting, he was returning to his house at 12107 Otsego in Detroit. (*Id*.) Johnson lived on the second floor of a two-story flat, and Petitioner's mother lived on the first floor. (*Id*. at 12, Pg ID 259.)

Johnson testified that when he returned home from the store at about 11:00 p.m. on New Year's eve, he went up the side stairs to the second floor front porch and was opening the door when Petitioner exited the side door of the lower flat. (*Id*. at 12-13, Pg ID 259-60.) According to Johnson, the area was well lit by a light

2

on the side of a neighboring house.  (Id. at 13, Pg ID 260.)  Nothing was covering

Petitioner's face.  (*Id*. at 15, Pg ID 262.)

Johnson greeted Petitioner, but then Petitioner pulled a handgun from his

waistband and started firing up at Johnson from the porch below.  (*Id*. at 13-14, Pg

ID 260-61.)  Johnson was hit in the leg and foot.  (*Id*. at 14-16, Pg ID 261-63.)

Johnson retrieved his own weapon from his flat, but by the time he returned

outside, Petitioner had fled down the street, entered a burgundy car, and drove

away.  (*Id*. at 16, Pg ID 263.)  Petitioner spent three days in the hospital.  (*Id*. at 18,

Pg ID 265.)

On January 5, 2012, Johnson went to the police station.  (*Id*. at 16-17, Pg ID

263-64.)  While leaving, Johnson noticed that his car was being followed by a

vehicle resembling the burgundy car Petitioner drove away on New Year's eve.

(*Id*. at 17, Pg ID 264.)  Johnson slowed his vehicle down, and the other car pulled

alongside him.  (*Id*.)  Petitioner was the driver.  (*Id*. at 18, Pg ID 265.)  Johnson

lowered his window and expressed his disappointment in what Petitioner had done.

(*Id*.)  Petitioner smiled and sped away.  (*Id*.)

At a later date, one of Petitioner's friends approached Johnson and offered

him $3,000 to drop the charges against Petitioner.  (*Id*. at 26-27, Pg ID 273-74.)

Johnson refused.  (*Id*.)

3

Petitioner's trial commenced about three months after the preliminary examination, on May 23, 2012. (5/23/12 Trial Tr., ECF No. 7-3.) The prosecutor informed the trial judge before jury selection that Johnson was now reluctant to testify because he had been assaulted and threatened. (*Id*. at 3-4, Pg ID 295-96.) The prosecutor further informed the court that Johnson was told he could be locked up if he did not appear in court, and an officer had been dispatched to locate and produce Johnson for trial. (*Id*. at 4, Pg ID 296.)

When Johnson appeared, the prosecutor examined him outside the presence of the jury. (*Id*. at 91-93, Pg ID 384-86.) Johnson testified that he did not want to testify because he had been threatened. (*Id*. at 93, Pg ID 395.) Johnson also testified that he was now unsure whether he was shot by Petitioner or Petitioner's brother, who Johnson claimed looked exactly like Petitioner. (*Id*. at 93-94, Pg ID 385-86.) Johnson indicated that "a lot of people" had told him that Petitioner was not the shooter. (*Id*. at 94, Pg ID 386.) The judge appointed counsel for Johnson because of the possibility he might perjure himself at trial. (*Id*. at 94-95, Pg ID 386-88.) The trial then proceeded, with the state calling Johnson as its first witness. (*Id*. at 98, 115, Pg Id 390, 407.)

Johnson testified that on December 31, 2011, his son and young nephews were staying at his flat. (*Id*. at 118, Pg ID 410.) He went to the store and returned at around 11:00 p.m. (Id. 118, 120, Pg ID 410, 412.) Johnson testified that as he

was opening the front door to his second-floor flat, he heard someone exit the side door of the flat below and saw someone wearing a hoodie and grey pants, who he thought was Petitioner.  (Id. at 120, Pg ID 412.)  Johnson claimed that it was kind of dark.  (*Id*. at 121, Pg ID 413.)  He equivocated as to whether the person was Petitioner or Petitioner's brother:

> And I looked, and at first I thought it was my cousin Tone [Petitioner], but I came to realize I don't - I don't know for sure now, you know.
>
> * * *
> I testified that it was him but I don't know now, you know.
>
> * * *
>
> I looked immediately, I thought it was my cousin Tone. I so messed up that I really just said, what up, Tone. I thought it was him. But like I said, it was either him or his brother. All I know is I was angry, I said it was Tone, though, 'cause it looked more like Tone.

(*Id*. at 120-124; Pg ID 412-16; *see also id*. at 144-45, Pg ID 436-37.)  Johnson testified that Petitioner and his brother look exactly alike.  (*Id*. at 125, Pg Id 417.)

Johnson testified that the person pulled out a gun and shot at him about eight or nine times, striking his leg, thighs, and foot.  (*Id*. at 144, 150, Pg ID 436, 442.)

The prosecutor questioned Johnson about any threats he received since his preliminary examination testimony.  (*Id*. at 123, Pg ID 415.)  Johnson testified about "[s]ome guys" in a truck hitting him on the head with a gun and trying to get him into their vehicle.  (*Id*.)  Johnson claimed they "knocked [him] out" and took

his wallet, but were unable to get him into the car because "some cars intervened." (*Id*.) According to Johnson, a "home boy" called "Head" offered him money not to prosecute Petitioner. (*Id*. at 158, 162, Pg ID 450, 454.)

Johnson also testified that after leaving the police station on January 5, 2012, he saw Petitioner driving in a car that looked like the one he saw on the night he was shot. (*Id*. at 130-31, Pg ID 422-23.) Johnson testified that when Petitioner pulled up next to Petitioner's car, Johnson said "I wouldn't have never did you like that, you know" and Petitioner responded "do what?" (*Id*. at 134, Pg ID 426.) According to Johnson, when he told Petitioner what he did, Petitioner said nothing and just drove away. (*Id*.)

The prosecutor pressed Johnson about a statement he gave to the police after the encounter, which led to Johnson testifying that Petitioner said he saw Johnson leave the police station and that if he was going to testify, he "ain't gonna make it to testify[.]" (*Id*. at 135-36, Pg ID 428-29.) Johnson then acknowledged that what he actually reported Petitioner saying is: "you hoe ass nigger, you won't make it to testify." (*Id*. at 137, Pg ID 429.) Johnson admitted that he also told the police on January 5 that Petitioner shot him and that he believed he was going to kill him. (*Id*. at 138-39, Pg ID 430-31.)

At various points during her questioning of Johnson, the prosecutor read questions posed to him at Petitioner's preliminary examination and his answers,

highlighting the inconsistencies in Johnson's testimony shortly after the incident and since being threatened.

On cross-examination, Johnson indicated that Petitioner had not threatened him since the shooting, but Petitioner's brother had. (*Id*. at 169, Pg ID 461.) Johnson also claimed that he did not really know what Petitioner said to him during their encounter after Johnson left the police station. (*Id*. at 183, Pg ID 475.) Johnson also testified that Petitioner had not threatened him before the shooting. (*Id*. at 174, Pg ID 466.) He described an argument between himself, Petitioner, and Petitioner's brother before the shooting, but said it really was something between himself and the brother. (*Id*.) Johnson also conveyed that he and Petitioner had resolved their disagreement. (*Id*. at 201-02, Pg ID 493-94.)

Petitioner's trial attorney challenged Johnson's conviction that Petitioner was the shooter, to which Johnson responded:

> I can't – like I said, you have to see his brother to believe me.
> So like I said, if it's him, I want him in jail. But I don't know if
> it's really him. They said it's his brother that did it.
>
> * * *
>
> I was angry. I'm going to tell you, I was – I just knew it was
> him. I said it was him because I, like I said, it looked like him
> and I couldn't say nothing else. I said it was him because, like I
> said, him and his brother look alike.

(*Id*. at 173-76, Pg ID 463-67.) Johnson testified that Petitioner and his brother in fact look like twins. (*Id*. at 201, pg ID 493.) When defense counsel asked Johnson

if he could tell the jury to a certainty that Petitioner shot him, Johnson responded: "No." (*Id*. at 178, pg ID 470.)

Petitioner's trial counsel brought out that when the police responded to the scene of the shooting, Johnson described the person who shot him as an "unknown black male." (*Id*. at 176-177, Pg Id 176-77.) Johnson testified that it was dark at the time of the incident and claimed that there was no light shining on the person who shot him. (*Id*. at 177-78, Pg ID 469-70.) Johnson admitted that he used marijuana on the night of the shooting. (*Id*. at 186, Pg ID 478.)

Following Johnson's testimony, at the beginning of the second day of Petitioner's trial, the prosecutor played a recording of a phone call Petitioner placed from jail on January 24, 2012. (5/24/12 Trial Tr. at 6-8, ECF No. 7-4 at Pg ID -523-25.) During the call, Petitioner talked about the idea of waiving the preliminary examination, explaining:

> see, anything happens, he get killed or anything, well, then, you know what I'm saying? . . . they can't still go on and prosecute me because there's not going to be a record of saying I did this to him. … The thing that he already wrote said I did to him, that—they can't use that in court. he got to be on the record saying something.

(*Id*.)

The prosecution then called two Detroit police officers to testify. Officer Lori Briggs, an evidence technician, testified about the condition of the scene of the shooting, which she examined a couple of days after the incident. (*Id*. at 11-16,

8

Pg ID 528-33.)  Officer Adam Szlarski testified that on January 5, 2012, he arrested Petitioner after a high-speed chase that ended when Petitioner crashed a burgundy colored Nissan.  (*Id*. at 18-24, Pg ID 535-41.)

Martina Allen testified for the defense. She testified that Petitioner is her boyfriend and that she spent New Year's eve with Petitioner, beginning at about five or six p.m.  (*Id*. at 32-33, Pg ID 549-50.)  Allen told the jury that she and Petitioner cleaned his house, went to her house at about eight or nine p.m., and then spent the remainder of the evening together cooking and watching movies. (*Id*. at 33-34, Pg ID 550-51.)

Claude May testified that he lives next door to the house where Johnson lived on the night of the shooting.  (*Id*. at 56, Pg ID 573.)  May arrived home from church services between nine and nine thirty p.m. on December 31, 2011.  (*Id*.) May and his brother were about to leave May's house to go to a restaurant when May heard four or five close gunshots and observed a man running between his car, which was parked half up the driveway, and the porch next door.  (*Id.* at 56-59, 74, Pg ID 573-76, 591.)  May saw the man run up the street and get into a car that was a brighter red than burgundy.  (*Id*. at 61-63, Pg ID 578-80.)

May described the man he saw as a "bigger guy", with a dark complexion, a beard, wearing a hoodie.  (*Id*. at 82, 79, Pg ID 579, 596.)  May indicated that he weighs 331 pounds and the shooter was big like himself.  (*Id*. at 70, Pg ID 587.)

9

May testified that he knows Petitioner, and the man he saw that night was not him. (*Id*. at 63-64, Pg ID 580-81.) May also knows Petitioner's brother, who he described as shorter than Petitioner, but slim as well.  (*Id*. at 70-71, Pg ID 587-88.) No Detroit police officer ever contacted May about the shooting.  (*Id*. at 64-65, at Pg ID 581-82.) A private investigator, who the prosecutor suggested worked for the defense, left a card in May's door and May called him.

Following arguments and instructions, the jury found Petitioner guilty of the offenses described above.  (*Id*. at 145-46, pg ID 662-63.)  Defense counsel subsequently filed a motion for new trial based on juror and prosecutorial misconduct. On November 28, 2012, the court denied the motion for new trial.

On June 13, 2012, the date scheduled for sentencing, defense counsel moved to withdraw because of a breakdown in the attorney-client relationship.  (6/13/12 Tr. at 4, Pg ID 672.)  The trial judge granted the motion and Petitioner retained new counsel who appeared at the new sentencing date, June 25, 2012.  (*Id*.; 6/25/12 Tr. at 3, Pg ID 7-6 at Pg ID 677.)  On that date, the trial court sentenced Petitioner as outlined earlier.

Petitioner then filed a direct appeal in the Michigan Court of Appeals, raising the following claims:

> I. The trial judge's ruling denied the defendant due process of law in the following ways: 1. The trial court abused its discretion when it barred the defense from cross examining the complainant about threats and promises made by the prosecutor in return for his

testimony. 2. The trial court abused its discretion when it permitted the prosecutor to play the recorded jail phone call.

II. Conduct by the prosecutor denied appellant a fair trial in the following ways: 1. The prosecutor vouched for her case, engaged in bolstering, argued facts not in evidence, argued facts she knew not to be true, and offered her personal opinion. 2. The prosecutor, in argument and by manner, denigrated defense counsel and shifted the burden of proof and misstated facts. 3. The prosecutor misstated the law. 4. The prosecutor commented on the defendant's right to counsel. 5. The prosecution introduced evidence of alleged threats to the witness which were neither proved nor connected to the defendant and argued that the defendant was a man of bad character. 6. The prosecution asked for sympathy for the complainant.

III. Defendant was denied the effective assistance of counsel in the following ways: 1. Defense counsel failed to call as a witness Deborah Hunter, the person who lived in the downstairs flat. 2. Trial counsel failed to object to prosecutorial misconduct. 3. Trial counsel failed to ask for a limiting instruction in regard to the stipulation that defendant had been convicted of a felony. 4. Counsel failed to move to strike the testimony concerning threats not made by defendant. 5. Counsel failed to object to the reading of examination testimony which implicated the defendant's right to counsel. 6. Trial counsel failed to object to the violation of his client's right to a public trial.

IV. There was insufficient evidence to support the verdict because the proofs were deficient both on the intent element and on defendant's connection to the crime.

V. Appellant's constitutional right to a public trial was violated when the trial judge locked the court room door during both opening and closing arguments.

Petitioner also filed a motion to remand the case to the trial court for an

evidentiary hearing on his ineffective assistance of counsel claim, which the

Michigan Court of Appeals granted. *People v. Stalling*, No. 311850 (Mich Ct. App.

June 14, 2013). The trial court then held an evidentiary hearing at which

Petitioner's trial counsel, Lilian Dialo, and Petitioner's mother testified. (ECF No.

7-7.) The trial court issued an opinion and order finding that trial counsel had not

been ineffective. *People v. Stalling*, No. 12-001195-01-FC (Wayne Cir. Ct. Dec.

23, 2013); (ECF No. 7-8.)

Petitioner's appellate counsel then filed a supplemental brief detailing

Petitioner's ineffective assistance of counsel claims:

I. The trial court erred in finding that appellant had not been denied the effective assistance of counsel.

1. Defense counsel failed to call as a witness Deborah Hunter, the person who lived in the downstairs flat.

2. Trial counsel failed to object to prosecutorial misconduct.

a. The prosecutor vouched for her case, engaged in bolstering, argued facts not in evidence, argued facts she knew not to be true, and offered her personal opinion.

b. The prosecutor, in argument and by manner, denigrated defense counsel and shifted the burden of proof and misstated facts.

c. The prosecutor misstated the law.

d. The prosecutor commented on the defendant's right to counsel.

e. The prosecution introduced evidence of alleged threats to the witness which were neither proven nor connected to the defendant and argued that the defendant was a man of bad character.

f. The prosecution asked for sympathy for the complainant.

3. Trial counsel failed to ask for a limiting instruction in regard to the stipulation that defendant had been convicted of a felony.

4. Counsel failed to move to strike the testimony concerning threats not made by defendant.

5. Counsel failed to object to the reading of examination testimony which implicated the defendant's right to counsel.

6. Trial counsel failed to object to the violation of his client's right to a public trial.

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion. *People v. Stalling*, No. 311050, 2014 WL 2917312 (Mich. Ct. App. June 24, 2014).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims he raised in the court of appeals. The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court. *People v. Stalling*, 861 N.W.2d 26 (Mich. 2015) (Table).

## II.  Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state

court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.' " *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of [the] petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woods v. Etherton,* No. 15-723, 2016 WL 1278478, at *3 (U.S. Apr. 4, 2016) (habeas relief is precluded if the state court's decision is "not beyond the realm of possibility [from what] a fairminded jurist could conclude.")  As the Supreme Court has otherwise expressed:

Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

## III. Analysis

## A. Procedural Default

Respondent contends that Petitioner procedurally defaulted several of his claims by failing to preserve them in the trial court. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if a state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, procedural default is not a jurisdictional bar to review of a habeas petition on the merits. *See Trest v. Cain*, 522 U.S. 87, 89 (1997). Additionally, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). It may be more economical for the habeas court to simply review the merits of the petitioner's claims, "for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue

involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In the present case, the Court deems it more efficient to proceed directly to the merits, especially because Petitioner alleges that his attorney was ineffective for failing to preserve the defaulted claims.

## B.  Prohibited Cross Examination

Petitioner claims that his Sixth Amendment right to confront witnesses was denied when the trial court sustained an objection during defense counsel's cross-examination of Johnson regarding his conversation with the trial prosecutor before trial.  Specifically, when defense counsel asked Johnson whether the prosecutor told him he had to testify consistently with his preliminary examination testimony identifying Petitioner as the shooter or risk perjury charges, the trial court sustained an objection, finding the question "improper."  (5/32/12 Trial Tr. at 178-80, ECF No. 7-3 at Pg ID 470-73.)

The Sixth Amendment guarantees an accused in a state criminal prosecution the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also Pointer v. Texas*, 380 U.S. 400, 407-08 (1965). Cross-examination is a "primary interest secured" by the Confrontation Clause. *Douglas v. Alabama*, 380 U.S. 415, 418 (1965); *see also Davis v. Alaska*, 415 U.S. 308, 315-16 (1974).

The Supreme Court "ha[s] recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally

protected right of cross-examination." *Davis*, 415 U.S. at 316-17. Therefore, "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis*, 415 U.S. at 318).

The Michigan Court of Appeals held that it was error for the trial court to sustain the objection and prevent Johnson from testifying about whether the prosecutor told him to testify in accordance with his preliminary examination testimony or face perjury charges, concluding it was relevant to Johnson's credibility. *Stalling*, 2014 WL 2917312, at *1. Nevertheless, the state court found the error harmless beyond a reasonable doubt and therefore not warranting relief:

> [D]efendant's argument is perplexing because the victim *did not* testify consistently with his preliminary examination testimony. Thus, even if the prosecution did instruct the victim to testify consistently with his earlier testimony, it is clear that such a mandate was ignored. Accordingly, to the extent that defense counsel's attempt to impeach the victim's testimony at trial was improperly curtailed, any error was harmless beyond a reasonable doubt because the premise for the impeachment (the victim's testimony was the same as his preliminary examination testimony only because of improper prosecution threats) did not exist, as the victim backed away from directly identifying defendant as the shooter at trial. Likewise, defendant has failed to establish any plain error that affected a substantial right on his constitutional, due-process claim.

*Id.* (emphasis in original).

Where the state court finds an error but concludes that it was harmless, the question on federal habeas review is whether the error " 'had a substantial and injurious effect or influence in determining the jury's verdict.' " *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). The Sixth Circuit instructs reviewing courts to apply the factors set forth by the Supreme Court in *Van Arsdall* when determining whether a Confrontation Clause error was harmless. *Vasquez v. Jones*, 496 F.3d 564, 574–75 (6th Cir. 2007). Those factors are:

> [1] the importance of the witness' testimony in the prosecution's case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross examination otherwise permitted, and …[5] the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684. Considering these factors in the context of *Brecht*'s broader test, the Court agrees that precluding Petitioner's trial counsel from cross-examining Johnson about whether the prosecutor threatened him with perjury charges did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citation omitted).

With respect to the first three factors, which all concern the importance of Johnson's trial testimony to the prosecutor's case, the analysis is altered by the fact that Johnson's trial testimony was more favorable to Petitioner than his preliminary

18

examination testimony. At trial, Johnson repeatedly indicated that he was not certain who shot him and that it likely was Petitioner's brother. This testimony standing alone would have likely resulted in a directed verdict of not guilty for Petitioner.

The prosecution's case was saved only by application of Michigan Rule of Evidence 801(d)(1)(A), which allowed the prosecutor to present Johnson's preliminary examination testimony as substantive evidence indicating that he previously identified Petitioner under oath as the shooter. Thus, as the state appellate court noted, Petitioner's claim of error is undermined by the fact that the point of the impeaching testimony—to explain why Johnson was motivated to testify consistently with what he said at the preliminary examination—was lost when Johnson contradicted his preliminary examination testimony and testified that he did not know who shot him. These first three factors weigh strongly in favor of finding the error harmless.

The fourth factor asks a reviewing court to consider the extent of cross-examination otherwise permitted. Petitioner asserts that the state court's harmless error analysis failed to consider that the refusal to allow the defense to properly cross-examine Johnson as to the prosecutor's threats or promises also barred testimony regarding prior statements, identification given at the scene, motives to lie, and coercion and suggestions made at the time of the initial interview. That is

not an accurate reflection of the record, however. While the ruling on the prosecutor's objection foreclosed defense counsel from questioning Johnson about whether he had been threatened with perjury charges, it did not preclude any of these other areas of inquiry. Indeed, a fair reading of the record shows that defense counsel was otherwise permitted to, and took full advantage of, her opportunity to obtain favorable testimony from Johnson.

During cross-examination, Petitioner's attorney obtained testimony from Johnson that his preliminary examination testimony and his prior statements implicating Petitioner were outright mistakes. (5/23/12 Trial Tr. at 175-78, ECF No. 7-3 at Pg ID 466-70.) Defense counsel solicited Johnson's concession that he was no longer sure of who shot him, and that he now believed it was Petitioner's brother. She brought out the fact that when Johnson first spoke to the police, he reported that an "unknown black male" shot him. (*Id*. at 176.) Thus, this fourth factor also weighs in favor of finding the error harmless.

Finally, a reviewing court is directed to look at the overall strength of the prosecution's case. This was not an iron-clad case. The complaining witness abandoned his identification of Petitioner as the shooter at trial, and to prove her case, the prosecutor was forced to retreat to his preliminary examination testimony and rely on evidence that he had been intimidated into changing his testimony. There was no other direct evidence linking Petitioner to the shooting. Yet, there

was one other piece of evidence strongly implicating Petitioner: the recording of his phone call from jail. During that call, Petitioner essentially called for Johnson to be killed or intimidated so that he would not testify at trial. The recording provided convincing evidence to support the prosecutor's narrative as to why Johnson changed his trial testimony from what was presented at the preliminary examination, and it undermined Petitioner's counter-narrative that Johnson's change in story was the result of cooled emotions or further reflection. Therefore, the Court finds that this factor also weighs in favor, though less strongly, of finding the error harmless.

On balance, and after consideration of the relevant factors, the Court finds that the trial court's limitation on the cross-examination of Johnson did not have a substantial influence or impact on the determination of Petitioner's guilt by the jury. The claim therefore does not merit habeas relief. [1]

---

[1] In Petitioner's supplemental habeas brief, he argues that the prosecutor's threats violated *Webb v. Texas*, 409 U.S. 95 (1972), and *Washington v. Texas*, 388 U.S. 14, 17-19 (1967), in that they interfered with his right to present testimony without fear of retaliation against the witness. (ECF No. 5.) Petitioner did not present this claim to the state courts and therefore it is unexhausted. *See* 28 U.S.C. § 2254(b). In any event, as discussed *supra*, Johnson was not intimidated into testifying in accordance with his preliminary examination testimony. Therefore, this unexhausted claim nevertheless is without merit. 28 U.S.C. § 2254(b)(2).

## C. Prosecutorial Misconduct

Petitioner asserts numerous allegations of prosecutorial misconduct in support of his request for habeas relief. The "clearly established Federal law" relevant to a habeas court's review of a prosecutorial misconduct claim is the Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *See Parker v. Matthews*, 567 U.S. 37, 43 (2012). In *Darden*, the Supreme Court held that a "prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Where a state court denies a prosecutorial misconduct claim, the federal habeas court must ask whether the decision " 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' " *Parker*, 132 S. Ct. at 2155 (quoting *Harrington*, 562 U.S. at 103).

The Michigan Court of Appeals considered each allegation of prosecutorial misconduct in lengthy detail and, after discussing the facts of each alleged act of misconduct, gave a reasoned explanation for rejecting the claim founded on its review of the trial record. *Stalling*, 2014 WL 2917312, at *3-9. The court reviewed Petitioner's claims in light of the record as a whole and, whether reviewing the alleged errors de novo or under a plain error standard, looked first to

whether the complained of conduct was improper and then the extent to which the conduct might have rendered Petitioner's trial unfair. Petitioner fails to establish that the state court's assessment of the record was inaccurate or that its rejection of his prosecutorial misconduct claims was contrary to, or an unreasonable application of, established United States Supreme Court law.

In Petitioner's supplemental brief, with respect to three allegations of prosecutorial misconduct, he attempts to show how the state appellate court's analysis was unreasonable. (*See* ECF No. 5.) Petitioner first asserts that, contrary to the Court of Appeals' opinion, there was no support in the trial record that the victim was threatened after the preliminary examination, thereby allowing the prosecutor to argue that threats were the cause of his change in testimony. (*Id.* at 5-6.) Petitioner also asserts that the state appellate court got it wrong when it found that the prosecutor accurately recounted Johnson's testimony regarding Petitioner's threats to him. (*Id*. at 6-7.) Finally, Petitioner asserts that the Court of Appeals mischaracterized the record with respect to the issue concerning "knots" on Johnson's head, allowing the prosecutor to falsely argue that Johnson was badly beaten prior to trial. (*Id*. at 7-8.) Petitioner's assessment of the record is not accurate, however.

With respect to Petitioner's first assertion, the victim indeed testified at trial that he was threatened after the preliminary examination:

23

> Q: Sir, since testifying at 36th District Court, have you had threats relating to your testimony?
>
> A: Yes, several of them. I had attempts on my life and everything. So –
>
> Q: I need you–sir, you say attempts on your life, what do you mean? I need you to tell this jury, what has happened to you.
>
> A: Some guys rolled up, trying to put me in a [trunk], hit me on the head with a gun, trying to get me in a car, until some cars intervened. So they just – they basically just knocked me out, took my wallet, you know, all that.

(5/23/12 Trial Tr. at 123, ECF No. 7-3 at Pg ID 415.)  Johnson also testified that Petitioner's brother threatened him, and that he received threatening phone calls but he could not identify the caller.  (*Id*. at 169, 207-08.)  Accordingly, contrary to Petitioner's argument, there was support in the trial record for the prosecutor to argue that Johnson changed his testimony due to threats occurring after the preliminary examination, and thus there was support in the record for the state appellate court to reasonably reject the allegation.

There also was support in the record for the court of appeals to reasonably reject Petitioner's next allegation of error regarding the prosecutor's recounting of Johnson's testimony concerning Petitioner's threats. While at points during trial Johnson denied that Petitioner threatened him (*see, e.g., id*. at 169, 189), the trial record also reflects Johnson's testimony that Petitioner said: "I saw you leave the police station, you ho ass nigger, you won't make it to testify." (*Id*. at 137-138.)

This testimony, together with the contents of Petitioner's phone call from jail, allowed the prosecutor to argue that Petitioner was the source of threats against Petitioner, and it allowed the court of appeals to reasonably reject the claim.

Finally, with respect to the "knots" on Johnson's head, Petitioner correctly asserts that defense counsel presented convincing medical record evidence that Johnson had the bumps before the shooting incident. (5/24/12 Trial Tr. at 108, ECF No. 7-4 at Pg ID 625.) This does not detract from the fact, however, that Johnson testified that after the preliminary examination, some guys hit him on the head with a gun and tried to get him into a truck and that he was knocked unconscious as a result. (5/23/12 Trial Tr. at 123, ECF No. 7-3 at Pg ID 415.) The thrust of the prosecutor's argument was that this attack influenced Petitioner's trial testimony.

Shortly after describing the attack, Johnson testified that the knots on his head cause him trouble in remembering things. (*Id*. at 140.) The prosecutor incorrectly inferred from this testimonyhat the knots resulted from the attack. Defense counsel corrected the error. (5/24/12 Trial Tr. at 108, ECF No. 7-4 at Pg ID 625.) Moreover, the trial judge instructed the jury as to what constitutes evidence in the case, and what the attorneys say was not included. (*Id.* at 125, Pg ID 642.) In light of the relative insignificance of this fact, that it was corrected, and the trial court's instructions, the Court of Appeals reasonably found that the

prosecutor's incorrect inference regarding the knots did not render Petitioner's trial fundamentally unfair.

Accordingly, Petitioner is not entitled to habeas relief based on his prosecutorial misconduct claims.

### D. Sufficiency of the Evidence

Petitioner next challenges the sufficiency of the evidence presented at trial to support his conviction. Petitioner argues that the evidence did not prove beyond a reasonable doubt that he intended to murder the victim. He also challenges the sufficiency of the evidence proving his identity as the shooter, noting the victim's recanting trial testimony.

In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The reviewing court may not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). "[E]ven were [the court] to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the court] must still defer to the *state appellate court's* sufficiency

determination as long as it is not unreasonable." *Id*. (emphasis in original); *see* 28 U.S.C. § 2254(d)(2).

After reciting the applicable constitutional standard, the Michigan Court of Appeals rejected Petitioner's sufficiency of the evidence argument "that there was insufficient evidence that he had the intent to murder because he did not shoot the victim at close range, he only struck his toe and lower leg, and the victim's injuries only required hospitalization for one day." *Stalling*, 2014 WL 2917312, at *12. The court reasoned:

> Although only two bullets hit the victim, he testified that he heard "about like eight or nine" shots and elaborated that it was more than three but less than ten. While the areas of his body where he was shot were not vital and the injuries were not severe, the fact that defendant fired several bullets tends to show that he had the intent to kill. See *People v. Davis,* 216 Mich. App. 47, 53; 549 N.W.2d 1 (1996) (sufficient evidence of intent to kill where defendant pulled trigger on gun several times, although no bullets fired). That the victim was not more severely injured can be understood as fortuitous. Viewing this evidence in the light most favorable to the prosecution, there was sufficient evidence that defendant intended to kill the victim.

*Id*.

The court also rejected Petitioner's argument "that the victim's 'equivocal identification testimony' did not furnish proof beyond a reasonable doubt that defendant was the shooter." *Id*. While the Michigan Court of Appeals acknowledged that Johnson's testimony was "equivocal", it found that his preliminary examination testimony identifying Petitioner as

the shooter was not.  *Id*.  The court explained that Petitioner's earlier

testimony therefore was admissible as substantive evidence under Michigan

Court Rule 801(d)(1)(A).  *Id*.  The court concluded that "the jury was

permitted to credit that account, and the evidence was sufficient to support

the jury's finding."  *Id*.

The appellate court's conclusion that Johnson's earlier testimony was

admissible was neither contrary to, nor an unreasonable application of, the *Jackson*

standard. Petitioner's claim amounts to an attack on the credibility of Johnson's

preliminary examination testimony. Petitioner lists a number of reasons why the

jury should not have credited that testimony. However, "[a] reviewing court does

not reweigh the evidence or redetermine the credibility of the witnesses whose

demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319 F.3d

780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

"A reviewing court 'faced with a record of historical facts that supports conflicting

inferences must presume—even if it does not affirmatively appear in the record—

that the trier of fact resolved any such conflicts in favor of the prosecution, and

must defer to that resolution.' " *McDaniel v. Brown*, 558 U.S. 120, 132 (2010)

(quoting *Jackson*, 443 U.S. at 326). Therefore, assuming the jury resolved

questions of credibility in favor of the prosecution, constitutionally sufficient

evidence was presented to prove Petitioner's identity as the perpetrator of the

crimes because Johnson testified with certainty at the preliminary examination that Petitioner was the person who shot him.

With respect to the intent to murder element, sufficient evidence was presented to support the court of appeals' decision. First, " 'malice is a permissible inference from the use of a deadly weapon.' " *Stewart v. Wolfenbarger*, 595 F.3d 647, 658 (6th Cir. 2010) (quoting *People v. Martin*, 221 N.W.2d 336, 340-41 (Mich. 1974)). Moreover, multiple shots were fired, even though Johnson was struck only twice.

The evidence presented at trial was therefore constitutionally sufficient to allow the court of appeals to reasonably reject Petitioner's sufficiency of the evidence claim.

### E. Public Trial

Petitioner asserts that his constitutional right to a public trial was violated when the trial court locked the courtroom doors during opening statements and closing arguments. The three Michigan Court of Appeals' judges who reviewed Petitioner's case divided on their reasoning for rejecting this claim. One judge reasoned:

> Here, the 'closures' … were innocuous. They only occurred during opening and closing arguments, the public nonetheless was permitted to stay, and the closures were undertaken so that the jury would not be distracted by people entering and leaving the courtroom. Consequently, it did not seriously affect the fairness, integrity, or public reputation of judicial proceedings.

*Stalling*, 2014 WL 2917312, at \*13. The other two judges found that the closure

constituted a structural error. *Id*. at \*14 (Gleicher, J., concurring). However,

because defense counsel did not object, the judges found the issue subject to plain

error review and held that Petitioner failed to establish entitlement to relief under

"that exacting standard." *Id*.

The record reflects that before opening statements, the court clerk

announced that the courtroom would be closed during the statements. (5/23/12

Trial Tr. at 97, ECF No. 7-3 at Pg ID 389.) Following this statement, the trial

judge asked anyone in the courtroom to remain and indicated that "the court room

is going to be locked because of the configuration of the jury box is such that it

looks directly at the door, and it is very disruptive to the court proceedings when

the parties are making their opening statements." (*Id*. at 106.) A similar statement

was made prior to closing arguments. (5/24/12 Trial Tr. at 90, ECF No. 7-4 at Pg

ID 607.) Petitioner's mother filed an affidavit indicating that she attended her

son's trial (ECF No. 7-9 at Pg ID 854), and there is no indication in the record that

any members of the public already in the courtroom during opening statements or

closing arguments were asked to leave.

The first step under § 2254(d) is to determine what constitutes "clearly

established" Supreme Court law pertaining to Petitioner's claim. *See Carey v.*

*Musladin*, 549 U.S. 70, 77 (2006). The Sixth Amendment guarantees that a

criminal defendant "shall enjoy the right to a . . . public trial." U.S. Const. amend. VI. This right is made applicable to the States through the Fourteenth Amendment. *See Waller v. Georgia*, 467 U.S. 39, 46 (1984); *Duncan v. Louisiana*, 391 U.S. 145, 148-149 (1968).

In *Waller*, the Supreme Court held that the complete closure of the courtroom to members of the public during a pretrial hearing violated the defendant's Sixth Amendment right to a public proceeding. 467 U.S. at 47-48. The Supreme Court identified four factors a court must consider, and findings a court must make, before excluding members of the public from a courtroom: (i) "the party seeking to close the [proceeding] must advance an overriding interest that is likely to be prejudiced;" (ii) "the closure must be no broader than necessary to protect that interest;" (iii) "the trial court must consider reasonable alternatives to closing the [proceeding];" and (iv) the trial court "must make findings adequate to support the closure." *Id*. at 48.

In *Presley v. Georgia*, 558 U.S. 209 (2010), the Supreme Court reaffirmed that a trial court must make the required findings under *Waller* before excluding all members of the public from the jury selection proceeding in a criminal trial. *Presley*, 558 U.S. at 213-14. The Supreme Court held that the trial court violated the defendant's Sixth Amendment right to a public proceeding when it failed to

consider alternatives to the removal of the single member of the public in attendance before the jury venire was brought in. *Id.* at 214-215.

The problem for Petitioner's claim is that both *Waller* and *Presley* and all other Supreme Court cases concerning the right to a public trial involve "full closures," where all members of the public were barred from attending a court proceeding. *Waller* involved the complete exclusion of members of the public from a courtroom during a pretrial suppression hearing. *Presely* involved the full closure of the courtroom during jury selection. Similarly, *Press-Enterprise v. Superior Court of California* involved the complete exclusion of the press and the public from jury selection. 464 U.S. 501, 503-504 (1984). As the Sixth Circuit recently noted, "[n]early all federal courts of appeals . . . have distinguished between the total closure of proceedings and situations in which a courtroom is only partially closed to certain spectators." *United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015). In *Simmons*, the court adopted a modified *Waller* test for partial closures "so that the 'overriding interest' requirement is replaced by requiring a showing of a 'substantial reason' for a partial closure, but the other three factors remain the same." *Id.* at 414 (citations omitted).

The fact that federal appellate courts have drawn a distinction between full and partial closures and altered the *Waller* test as a result is significant for purposes of § 2254(d) review. This is so because if federal appellate courts can reasonably

modify the *Waller* test for a partial closure, then it necessarily follows that the clearly established Supreme Court standard only applies to full closures. *See Drummond v. Houk*, 797 F.3d 400, 403 (6th Cir. 2015) (finding no clearly established Supreme Court precedent as to how the rules in *Waller* apply in cases where some spectators, but not all of them, were removed from the courtroom).

A reasonable assessment of the trial court record reflects that what occurred in Petitioner's case was a partial closure.[2] The trial court did not remove members of the public (consisting of at least Petitioner's mother) from the courtroom during the attorneys' arguments. It only prohibited members of the public from entering or exiting during those portions of the trial. The trial court appeared to be addressing members of the public seated in the courtroom when it announced that it was locking the courtroom doors. The court stated, "Ladies and Gentlemen, we're going to begin opening arguments. If anybody would like to leave, leave now. . . ." (5/23/12 Trial Tr. at 97, ECF No. 7-3 at Pg ID 389.) This indicates that there were

---

[2] 28 U.S.C. § 2254 states with respect to factual findings:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). Thus, it was Petitioner's burden to rebut the state court's finding that members of the public were present for opening statements and closing arguments.

members of the public present, and the court stated it would allow those present to stay: "If you want to leave, leave now. If not, you're here for the duration of the arguments." (*Id.*)

Accordingly, unlike the relevant Supreme Court cases, opening statements and closing arguments in Petitioner's case were not fully closed to members of the public. Rather, the proceedings were only partially closed to those members of the public who were not already present in the courtroom when the arguments commenced. Because the closure was a partial one, Petitioner's claim cannot be based on clearly established Supreme Court law. *Drummond*, 797 F.3d at 403.

Moreover, under circumstances strikingly similar to the present case, the Sixth Circuit found no violation of the defendant's right to a public trial because the public was not prohibited from attending the entire trial. *United States v. Dugalic*, 489 F. App'x. 10 (6th Cir. 2012). In *Dugalic*, the judge informed the spectators in the courtroom that once closing arguments began, the doors would be locked to prevent the jury from being distracted by people coming in and out. *Id.* at 19. The Sixth Circuit held that "the public was not denied access to the courtroom during closing arguments; it was merely prevented from entering and leaving the courtroom while those arguments were going on." *Id.*

For these reasons, this Court concludes that the result reached by the Michigan Court of Appeals was neither contrary to, nor an unreasonable

application of, clearly established Supreme Court law.  Accordingly, the Court finds that Petitioner has failed to demonstrate entitlement to relief with respect to his public trial claim.

## F.  Ineffective Assistance of Counsel

Petitioner claims that his trial counsel was ineffective for a number of reasons.  Though Petitioner lists this as his second claim, the Court discusses it last because several of the allegations of ineffective assistance concern counsel's failure to object to the alleged trial errors discussed and rejected above.

After reciting the controlling constitutional standard, the Michigan Court of Appeals rejected Petitioner's ineffective assistance of counsel claim.  The court rejected Petitioner's claim based on trial counsel's failure to object to prosecutorial misconduct, inquiries regarding threats made to Johnson, the introduction of Johnson's preliminary examination testimony, and the closure of the courtroom because it already found no merit to the underlying error.  *Stalling*, 2014 WL 2917312, at *10-11.  The Michigan Court of Appeals rejected Petitioner's claim based on counsel's failure to call his mother to testify and to request a limiting instruction regarding the stipulation pertaining to Petitioner's prior felony conviction because it credited trial counsel's explanations for her conduct based on trial strategy.  *Id*.

Ineffective-assistance claims are reviewed under the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a defendant to show that counsel's performance was deficient and that the deficient performance prejudiced the defense such that the defendant was denied a fair trial. *Id*. at 687. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The test for prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In habeas review, the question becomes "not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

Similar to its treatment of Petitioner's prosecutorial misconduct claims, the Michigan Court of Appeals decision rejecting Petitioner's ineffective assistance of counsel claim was thorough and based on a reasonable view of  both the trial record and the record made at the evidentiary hearing held after remand. In fact, to the extent the Michigan Court of Appeals deferred to the trial court's credibility determinations made after the evidentiary hearing, the appellate court's decision was reasonable in light of the deference appellate courts owe to trial judges on witness credibility issues. *See Felkner v. Jackson*, 562 U.S. 594, 598 (2011).

Moreover, for purposes of federal habeas review, the trial court's factual determinations are entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). Petitioner has not demonstrated through clear and convincing evidence that the trial court erred in any of its factual determinations. See 28 U.S.C. § 2254(e)(1).

The Michigan Court of Appeals examined each of Petitioner's allegations of ineffective assistance within the *Stickland* framework, and made a reasoned judgment denying relief. . His supplemental brief attempts to attack the court of appeals' reasoning with respect to Petitioner's confrontation, prosecutorial misconduct, and public trial claims. (ECF No. 5.)

Trial counsel's failure to object to evidence of threats, prosecutorial misconduct, and the closure of the courtroom did not result in *Strickland* prejudice because none of the underlying claims have merit for the reasons stated above. *See, e.g.*, *Bradley v. Birkett*, 192 F. App'x 468, 475 (6th Cir. 2006). As to trial counsel's failure to call Petitioner's mother to testify, counsel testified at the evidentiary hearing that she spoke with Petitioner's mother several times before trial—an assertion confirmed by Petitioner's mother. (8/15/13 Tr. at 39, 42-43, 66, ECF No. 7-7 at Pg ID 724, 727-28.) Believing that Petitioner's mother would lie and appeared to have a drinking problem, defense counsel testified that she concluded she would not make a good witness. (*Id*. at 40-46, 51.) According to

trial counsel, Petitioner also agreed before trial that his mother should not testify. (*Id*. at 50.)

The trial court credited this testimony as true. It was reasonable for the state courts to reject this allegation of ineffective assistance because, even if Petitioner's mother would have testified favorably for Petitioner, defense counsel concluded that she was not a credible witness and nevertheless would hurt Petitioner's defense. Moreover, Petitioner establishes that his mother's testimony would have assisted his defense only by showing that Johnson said he did not know who shot him immediately after being shot. Defense counsel introduced this evidence through other witnesses, however. *See supra*.

Petitioner argues that counsel should have requested an instruction informing the jury that it could consider Petitioner's prior felony only for purposes of that offense. However, the decision not to request the limiting instruction is exactly the type of tactical decision insulated by *Strickland*. As the trial court reasoned in rejecting Petitioner's claim, a decision not to request a limiting instruction is sometimes made to avoid a second mention of a defendant's prior felony. The allegation was reasonably rejected.

Finally, Petitioner claims that his counsel was ineffective for failing to move to strike the portion of the preliminary examination testimony where Johnson referred to Petitioner's "legal team." But as the appellate court reasonably found,

this statement came as part of Johnson's preliminary examination testimony where he directly identified Petitioner as the shooter. Moreover, Johnson's reference to a "legal team" was not a comment on Petitioner's exercise of his right to counsel. Rather, it was Johnson's way of stating how certain he was of his identification:

> I don't want to put him in jail, but it gotta lead to this because it's going to get bigger. If he come out, I don't want him dead. It's just going to be the truth. You shot me, I know you shot me. Ain't nothing, a legal team or nothing can tell me, you shot me. You know you shot me. That's just point blank.

(5/23/12 Trial Tr. at 163-64, ECF No. 7-3 at Pg ID 455-56.)

The prior testimony was offered as substantive evidence for the truth of the matter asserted under Michigan Rule of Evidence 801(d)(1). There was no basis for objection. In any event, Petitioner's counsel did object to the prosecutor offering the prior testimony, but her objection was overruled. (*Id*. at 161.)

Accordingly, the state court's adjudication of Petitioner's ineffective assistance of counsel claims did not result in an unreasonable application of the *Strickland* standard.

## IV. Conclusion & Certificate of Appealability

As none of Petitioner's claims merit relief, the Court is denying his application for the writ of habeas corpus.

In order to appeal the Court's decision, Petitioner must obtain a certificate of appealability. To obtain a certificate of appealability, Petitioner must make a

substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, Petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002).

Here, jurists of reason could debate the Court's conclusions with respect to Petitioner's first and fifth claims (confrontation and public trial). Therefore, the Court is granting Petitioner a certificate of appealability with respect to those claims. Petitioner has not met the standard for a certificate of appealability with respect to his other claims as set forth above..

Accordingly,

**IT IS ORDERED** that the Court **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus;

**IT IS FURTHER ORDERED** that the Court **GRANTS** Petitioner a certificate of appealability with respect to his first and fifth claims, but **DENIES** a

certificate of appealability with respect to his remaining claims.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: July 12, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, July 12, 2017, by electronic and/or U.S. First Class mail.

s/ Richard Loury
Case Manager